In the Matter of the Judicial Settlement of the Account of Proceedings of BROOKLYN TRUST COMPANY, as Temporary Administrator, and BROOKLYN TRUST COMPANY and CHARLES H. GEORGE, as Executors, etc., of CLAUDE C. PINNEY, Deceased.*

BROOKLYN TRUST COMPANY, as Temporary Administrator, etc., Respondent, and as Executor, etc., of CLAUDE C. PINNEY, Deceased, Appellant, Respondent; CHARLES H. GEORGE, as Executor, etc., of CLAUDE C. PINNEY, Deceased, Appellant, Respondent; KATHERINE C. PINNEY, Residuary Legatee and Objectant, Respondent, Appellant.

First Department, February 26, 1937.

* Revg. 156 Misc. 844; Id. 855.

*John Godfrey Saxe* of counsel [*Francis L. Durk* and *John H. Johnson* with him on the brief; *Beekman, Bogue, Leake, Stephens & Black*, attorneys], for the Brooklyn Trust Company, as executor, etc.

*Walter R. Herrick* of counsel [*Herrick, Hoppin & Thorne*, attorneys], for Charles H. George, as executor, etc.

*Selig Edelman* of counsel [*Jonas & Neuburger*, attorneys], for Katherine C. Pinney, the residuary legatee and objectant, etc.

O'MALLEY, J. The decree appealed from surcharges the executors in the sum of $195,000 with interest from December 9, 1929, to the date of the decree, denies them commissions and charges them personally with costs and disbursements in a sum exceeding $1,200. The executors assert that such surcharge, denial of commissions and imposition of charges for expenses and disbursements were unjustified. The appellant-objectant, Katherine C. Pinney, urges error on the part of the surrogate in denying relief to the objectant as against the Brooklyn Trust Company, as temporary administrator, claims inadequacy of the principal amount of the surcharge against the Brooklyn Trust Company as one of the executors and inadequacy of the surcharge against both executors, and seeks modification to increase the surcharge.

The issues raised by the objections filed by Katherine C. Pinney were originally sent to a referee to examine the account and objections and to hear and determine all questions arising upon the settlement which the surrogate had power to determine, and to report. This report contained findings and conclusions, overruled and dismissed as being without merit, all objections to the account of the Brooklyn Trust Company (hereinafter referred to as the trust company) as temporary administrator, and to the accounts of the executors.

The surrogate in his decision sustained the dismissal of the objections to the account of the temporary administrator; sustained the referee and overruled exceptions to the so-called Cuban National Syndicate stock (respecting which the appeal taken is now waived

by the objectant), but overruled the referee and sustained objections to the account of the executors, in so far as it related to the sale of the Stock Exchange seat owned by the testator.

The surcharge referred to represents the loss, as found by the surrogate, resulting from the failure of the executors within sixty days after their appointment to sell the seat. Such sale was held to be their duty under a direction in the will that the seat should be sold " as promptly as possible " after the death of the deceased, followed with a direction to pay the $10,000 gratuity fund attached thereto to his wife, the objectant. The referee had held that she, as sole residuary legatee under the will, was equitably estopped from claiming a surcharge for loss resulting in a delay in selling the seat, holding that " What they [the executors] did and what they omitted to do was with the consent, acquiescence, and it may fairly be said with the direction of the sole residuary legatee, a person of mature judgment, not without knowledge of business affairs."

The surrogate, while holding that there was a " true estoppel " against the objectant as of a specific date, hereinafter referred to, ruled that prior to such time there was no estoppel; and that while there was no evidence of " intentional wrongdoing " on the part of the executors, there was " negligence and maladministration."

The appeal is dependent chiefly upon the issue of law thus presented. If the objectant is estopped from claiming any surcharge, the decree must be reversed. It will then become unnecessary to consider the claim of the respondent on her cross-appeal, in so far as an increase in the surcharge is sought. We approach this question in the light of the facts adduced.

The testator died June 27, 1929. For reasons which seem immaterial the will was not admitted to probate until October 7, 1929, and letters testamentary issued two days later. Except for a few minor legacies, the testator gave everything to his wife outright " to be her sole property and estate."

In the meantime, however, and on August 20, 1929, the trust company was appointed temporary administrator. The appointment was made upon the petition of Mrs. Pinney, who had as her attorneys the firm which represented both Mrs. Pinney and the temporary administrator and the executors from the date of the death of the testator. These attorneys were selected by the temporary administrator and the executors on the intervention of Mrs. Pinney, in place of and instead of the attorney who had drawn the will and whom the trust company had decided to engage.

We deem it unnecessary to refer at length to the temporary administration, for the reason that we agree both with the referee

and the surrogate that the trust company as temporary administrator is not liable to a surcharge. While at the date of the death of the testator the seat was appraised at $395,000, the sale price of seats between such date and the date of qualification of the executors, October 9, 1929, had increased to the extent of some $30,000. If there had been an accounting by the temporary administrator immediately after the appointment of the executors, there could not have been a surcharge because of this increase in value.

It is the claim of the objectant that during the temporary administration, Mrs. Pinney made a demand upon Mr. Diller of the trust company that the seat be sold and the surrogate seems to have so found. We are unable to agree that the evidence justifies this conclusion. There was no specific demand that the seat itself be sold apart from other assets. Mrs. Pinney was desirous of disposing of some assets so as to realize cash, and during negotiations had for this purpose she was informed (erroneously) that the seat could not be sold during the temporary administration, but would have to wait the appointment of the executors. Her petition for the appointment of the temporary administrator did not mention the sale of the seat as one of the reasons for its appointment. Her application was based solely upon the ground that the appointment was necessary for the purpose of selling out and protecting a speculative margin account held by the testator.

As already appears the executors qualified October 9, 1929. Immediate steps were taken to dispose of the seat in compliance with the direction of the will, and five days later, on October fourteenth, an offer to sell for $496,000 was filed with the secretary of the Stock Exchange. This offer remained on file until October 29, 1929, the day after the first serious so-called " break " in the market took place.

This is not a case, therefore, where the executors entirely ignored the direction to sell promptly, and, had it not been for the " break," the seat in all likelihood would have been disposed of at the price at which it was first offered to the satisfaction of all concerned.

The facts relied upon by the executors to show estoppel are now to be considered. Unfortunately their recital will necessitate a statement which may seem of inordinate length.

The individual executor, George, was a friend of both the deceased and Mrs. Pinney. The deceased had been associated with the brokerage firm of Hemphill, Noyes & Co., and was well acquainted and had a rather close association with Mr. Harold Strong of that firm. Mrs. Pinney was also acquainted with Strong, and she herself had a margin account with Hemphill, Noyes & Co., and after her husband's death, Strong handled her transactions.

Coming from the funeral of the deceased, George suggested an appointment with a Mr. Burdick, who drew the deceased's will, with a view to having him appointed attorney for the executors, and accordingly an appointment was made to meet Burdick at the trust company's office on the morning of July first. Mrs. Pinney, however, instead of keeping this appointment, called on Strong at the office of Hemphill, Noyes & Co. and as a result of that visit the firm of Beekman, Bogue & Clark was agreed upon as the attorneys to be selected by the executors, and as a result, they were engaged by the trust company and Burdick, the attorney who had drawn the will, was told that his services would not be required. Whether the selection of these attorneys resulted from Strong's suggestion, as claimed by the executors, or that of a member of the brokerage firm, as claimed by the objectant, seems immaterial. Thereafter, the firm of Beekman, Bogue & Clark served in a dual capacity not only as attorneys for the executors, but also for Mrs. Pinney herself.

As already appears in the proceedings for the appointment of a temporary administrator, this firm appeared for Mrs. Pinney. In addition, on September 20, 1929, by formal instrument, she appointed Wolcott, a member of this firm, and two of his associates as her attorneys in fact, with power to represent her and deal with her individual interests in the estate and also with her personal affairs. They were given power " to deal generally in any manner with respect to my interest in the estate;" to consent to the judicial settlement of the executors' account, and execute waivers of citation; to collect dividends on stocks owned by her and other moneys payable to her from any source; to sell and transfer securities; to purchase and subscribe for such securities as they might deem proper and to draw on her bank account; to check against such accounts and to make promissory notes in her name; and to, deal generally with her brokerage account involving the giving of directions to withdraw securities or cash.

This power of attorney was sent to the trust company by Mrs. Pinney in connection with a loan arranged for by her attorneys and she stated that it was inclosed " for use in the event the occasion arises in connection with the foregoing or in connection with my interest in the estate of Claude C. Pinney."

It was the claim of the executors that they were fully justified in believing that Beekman, Bogue & Clark represented Mrs. Pinney's wishes in respect to the disposition of the Stock Exchange seat, in view of the manner in which they were selected as attorneys for the executors, and chosen also to represent herself, and under the broad powers they possessed in the power of attorney delivered

to the trust company. We think that this claim on the part of the executors is not without force and that the finding that these attorneys did not purport to represent Mrs. Pinney in the sale of the seat was not justified. The extent to which they participated in negotiations for an attempted sale will hereafter appear.

The claim of the executors that they were informed by Mrs. Pinney to consult with or take the advice of Strong, together with that of George, the individual executor, in connection with the sale of the seat; that he was her financial adviser; and that she would be guided in the matter by Strong's advice, finds ample support in the evidence and more particularly in her own writings. Their evidence was to the effect that Mrs. Pinney expressed her wishes in this respect to Wolcott at the conference on July first, when the selection of attorneys was agreed upon; that she later and before departing for California on September 21, 1929, again so informed him and that George had told him that she had so informed him. These instructions were communicated to the trust company. That Strong was her adviser finds support in the fact that he was consulted with respect to the settlement of the Waters' claim against the estate, in regard to closing out a speculative stock account and the sale of other stocks. While Mrs. Pinney denies that she had given any oral instructions on the subject before leaving for California, it was admitted that Strong was consulted about the first offer to sell and that it had his approval. Why should Strong have been consulted in respect to this first offer, if Mrs. Pinney had not instructed her attorney so to do? The referee who heard and saw the witnesses was justified in rejecting Mrs. Pinney's testimony on this issue, especially when considered in connection with letters subsequently written by her.

Moreover, it appears that prior to the time that the first offer of $496,000 was filed with the secretary of the Stock Exchange, Mrs. Pinney was informed by letter that Strong was being consulted. On October tenth Wolcott wrote her to the effect that in co-operation with Strong and George the offer was to be made and that as soon as it had been filed " at such price as Mr. Strong and Mr. George may advise," Wolcott and George would attend at the trust company to arrange for the transfer of cash to which Mrs. Pinney was entitled on her account with Hemphill, Noyes & Co. On the same date Wolcott wrote George to the effect that the offer was about to be filed on behalf of the executors and " we are awaiting advice from you and Mr. Strong before fixing the price."

The prices at which seats were offered for sale between October fourteenth and October twenty-ninth ranged from $494,000 to

$525,000. Only one seat was offered at a price of less than $496,000, and that for $495,000 on October twenty-fourth. Two seats seem to have been sold for $494,000 on that date, one consisting of full rights, and the other an estate seat sold by private agreement. The next sale after the crash was on November fourth for $450,000.

On the day following the crash Mr. Campbell, of the firm of Beekman, Bogue & Clark, consulted with Mr. Green, the secretary of the Exchange, who advised taking no action towards selling the seat at that time, expressing the opinion that when conditions settled the Stock Exchange membership would be as valuable as ever. The interview was reported to Strong, who informed Campbell that he "was going to consider the advisability of lowering the offered price of this seat from $496,000 to $480,000," and would communicate with George. While Strong testified he had no recollection of this conversation and was told of the reduction after it had been made, the conversation as related by Campbell is confirmed by an entry made in his diary to the effect that Strong expressed the opinion that the price should be lowered to $480,000.

On November first Campbell wrote Mrs. Pinney reporting the substance of his conversation with the secretary of the Exchange and notifying her that he would keep in touch with Green in order that proper steps might be taken to sell the seat when it was advisable. Mrs. Pinney wrote Wolcott on November fifth saying, " I will be guided by you and Mr. Strong as to the seat sale. I doubt if [it] will bring as much after all this trouble in spite of what Mr. Green says."

On November seventh, following a period of temporary recovery, Campbell consulted Strong and it was agreed to lower the price to $475,000. Diller of the trust company and George agreed and the trust company was so notified by Campbell.

On November ninth Wolcott wrote Mrs. Pinney in part as follows:

" We have again gone into the situation thoroughly with Messrs. Strong, George and Diller, with the result that we have reduced the offer of the seat to $475,000. * * *

" As you will note from this letter, I am doing nothing of a business nature in connection with your affairs without first consulting Mr. George and Mr. Strong."

The reduced price of $475,000 was filed with the Exchange November thirteenth. On December fifteenth a letter was received from Mrs. Pinney which she wrote on December ninth in reply to a letter from Campbell advising her of an improvement in conditions and in which he stated that he was keeping in continual touch with the situation, communicating all information " to Mr. Strong and Mr. George." Mrs. Pinney stated in her letter: " I, too, am of the

opinion that we should delay selling the seat until we get a better price. I can manage. My life here is simple and Mother helps me out."

It is interesting to note the prices of seats at or about the time this letter was written, as compared with the appraised value of the seat at the time of Mr. Pinney's death. A seat sold on December twelfth for $425,000; another for $422,000 on December fourteenth, and another on December sixteenth for $420,000. From these facts it is argued by the appellants-executors that it was Mrs. Pinney's desire to hold the seat until the market came back somewhat nearer the price at which it had been originally offered. However this may be, at least it evinces her disinclination to sell at that particular time.

After the offer to sell at $475,000 was filed, prices continued to fall through January and February, 1930, and seats were sold for as low as $390,000. Late in January, Mrs. Pinney returned from California. She called at the trust company and saw Mr. McLaughlin, its president, who testified in substance that he discussed with her the drop in prices and that she explicitly told him that she was unwilling to sell at that time and was relying and intended to rely upon the advice of Strong and that he was going to watch things, and that her husband had implicit faith in his judgment.

He further testified that at the time he did not insist on the sale as he did not wish to override her wishes. It should be noted, however, that Mrs. Pinney denied this testimony of McLaughlin and said that he told her that conditions were improving and that it was his opinion the seat should not be sold. However, she also testified that she agreed that the seat should not be sold and on cross-examination testified: " Mr. McLaughlin told me what they were selling for, but I was still thinking of the $490,000 when I said there was a $100,000 drop. * * * I always kept thinking of around $490,000."

On the same day she also saw Wolcott, one of her attorneys. He testified that she then told him that she had conferred with Strong and did not want to sell the seat at the present and wanted the executors to be guided by Strong's advice before making the sale. Mrs. Pinney also denied this conversation. However, the attorney's registry recording this interview contains the following: " Mrs. Pinney advises that after conferring with Mr. Strong, she has decided for the present not to sell the Stock Exchange seat, and that the time of the sale of the seat and the investment of the proceeds of the sale will be entirely determined by Mr. Strong's advice."

McLaughlin testified to another interview he had with Mrs. Pinney in the following June, in which he again called her attention to the seat. She again stated that she would rely upon the advice of Strong as to the matter of her investments. While admitting that she was in New York late in May and saw George and Strong and Wolcott, she denied that she talked with McLaughlin at any time in 1930, except in January.

Between February 3, 1930, and April 4, 1930, prices for seats rose from $390,000 to $467,000. On February 10, 1930, Mrs. Pinney wrote to Campbell at a time when seats were selling at $400,000, and stated " It seems dreadful to sell the seat at such a low point to pay bills, when, as I understand it, if the stocks had been sold as agreed there would have been cash on hand."

In reply to a letter from Mrs. Pinney, Campbell wrote her on February twentieth, in which he said Wolcott expected to speak to Strong within the next few days regarding the seat. She replied on February twenty-fourth, when seats were selling for upwards of $400,000, as follows: " As to the seat, the initial delay was such an expensive business that I feel that perhaps the spring might bring better prices. If Mr. George and Mr. Strong agree, I am willing to wait. I hate to take such a terrific loss if not necessary.

" Up to date I have paid top prices for any settlements necessary and I should like now to save as much as possible.

" I wish to abide by Mr. Strong and Mr. George decision in the sale of the seat, entirely."

On March twenty-fourth, when prices had risen to about $413,000, Wolcott conferred with Strong and discussed with him the advisability of lowering the price and Strong said he would write Mrs. Pinney and give her his recommendation. The next day Wolcott wrote Strong calling his attention to current prices and said: " It would seem to me that it is now in order for the various reasons which we have discussed to offer the seat of the above estate for sale at $425,000. If you will take this up with Mrs. Pinney and let me know the result, I will, in turn, advise the executors and will take care of giving the necessary notice to the Exchange."

Wolcott also wrote Mrs. Pinney on March twenty-fifth that the important thing for consideration was whether the seat should be sold at that time. He reported that he had conferred with Strong on this particular point and that it was understood that Strong was to give Mrs. Pinney his views as to the situation. Wolcott gave in substance as his personal opinion that as this asset was yielding no income it was perhaps better to sell it. The last sale he reported in this letter as having taken place on March eighteenth for $415,000; that there were two seats now offered, one at that price and another at $425,000.

On March twenty-seventh Campbell also wrote her stating that he thought it was advisable to sell the seat and that Strong was writing to her about it. Campbell stated, however, that her consent was desired as to the selling price and requested that she write them, or Strong, as to the price.

All of these communications lead to but one conclusion, that Mrs. Pinney was exercising what might be styled a veto power on the authority to sell and that she had made it clear that ultimately the sale was to have Strong's approval. They also show, as other evidence shows, that her attorneys, Wolcott and Campbell, of the firm of Beekman, Bogue & Clark, were actively participating at all times in the negotiations for the sale of the seat.

On March thirty-first Mrs. Pinney wrote Campbell stating that she had received a letter from Strong and that she was agreeable to Strong's suggestion of a price of $440,000 to $450,000.

It is upon this letter that the learned surrogate based his finding that in the spring of 1930 the executors secured Mrs. Pinney's " assent to a sale " at a price of $440,000 to $450,000. But this assent, it is to be noted, is coupled with the condition that Mr. Strong's approval was necessary. In this letter Mrs. Pinney stated: " I had a letter from Mr. Strong in regard to the seat. I am agreeable to his suggestion $440,000 to $450,000, whatever Mr. Strong says will be alright with me."

The fact remains that Strong never expressly consented to sell at either of these prices. He did not reply to the letter of Wolcott on April third which informed him of Mrs. Pinney's letter and of her willingness to sell, although he was specifically requested so to do " in order that we may formally revise the offer of the executors to sell the seat." At this time an offer to sell at $475,000 was on file. Shortly thereafter the offer was withdrawn.

McLaughlin testified that George told him on or about April ninth that he and Strong, on their own initiative, had withdrawn this offer. No consent of such withdrawal on the part of the trust company was shown except as might be implied from Campbell's participation therein. But as already appears he was acting for Mrs. Pinney as well as for the executors.

Between April fourth and April twenty-third there were no sales, and five days after the withdrawal both George and Strong set up a new offering price of $490,000, which Campbell communicated to the Stock Exchange by telephone and confirmatory letter. Strong admits that this new offer had his approval.

On the other hand McLaughlin was attempting to have the seat sold at prevailing prices. He so advised George. A sale was had on April fifth for $467,000, while the seat here in question had

been inventoried or appraised, as already appears, at only $395,000. George did not agree, but stated that Mrs. Pinney would be advised by Strong and that the latter's advice was to be followed, setting up a new price of $490,000. McLaughlin was corroborated by a memorandum then and there made as to this interview.

Thereafter there was a sale of a seat for $480,000, but the offer of this particular seat at $490,000 was not accepted.

This new price of $490,000 was confirmed by Strong in a letter of April ninth written to Wolcott, in which he stated that he had George's consent to anything which he (Strong) cared to do for Mrs. Pinney or the estate.

On the same date George wrote McLaughlin stating that after he had conferred with Strong and the secretary of the Stock Exchange the new price had been fixed. He also said that this would be agreeable to Mrs. Pinney, who was in communication with Strong, and that if these two parties desired to change the price, such would be agreeable to him (George).

The attorneys accordingly offered the seat for sale at $490,000, and so informed the trust company, stating that such had been decided upon by George and Strong. On April twenty-fourth, twenty-fifth and twenty-ninth seats were sold for $480,000, but the price set of $490,000 for the Pinney seat was not accepted.

Towards the middle of May Mrs. Pinney came to New York with her husband, Colonel Humphrey, and conferred with George and Strong. George said that when he expressed the opinion the seat should be sold Mrs. Pinney said she would consult with Strong, but she did not communicate again with George, although seats were then selling at $465,000.

Mrs. Pinney, on the other hand, testified to the effect that she informed Wolcott that George and she had already agreed to sell the seat and to this Wolcott agreed. This claim of Mrs. Pinney seems to be refuted by the fact that on the day this conversation with Wolcott was alleged to have been had, May twenty-third, the latter had written Mrs. Pinney in Illinois with reference to an over draft. This tends to show that Mrs. Pinney was not in New York on the day of this alleged conversation. Moreover, in her reply to Wolcott's letter five days later she failed to mention the agreement to sell.

On May 26, 1930, Silleck, trust officer of the trust company, phoned George stating that it was the judgment of the trust company that the seat should be sold at the prevailing price. George again said he would take it up with Strong and that everything was being done with the approval of Mrs. Pinney.

On May twenty-ninth Wolcott wrote Strong stating that George had suggested a price of $475,000, and on June third George wrote Mrs. Pinney stating that he asked Wolcott to consult with Strong as to the seat and that perhaps it would be wise to reduce the price from $490,000 to $475,000.

It is important to note that on June 7, 1930, Mrs. Pinney wrote Wolcott that as to the seat, she had to be guided by Strong and George. Clearly, if she had given any specific instructions to sell during her visit in May, she would not have so written early in June.

Other endeavors were made to have Strong reduce the price and there was a reduction from $490,000 to $475,000. Some controversy exists as to whether Strong had really been consulted, but from the standpoint of the trust company it clearly acted on the theory that both George and Strong had approved the new price.

On June seventeenth Silleck, of the trust company, again took the matter up with George stating that the trust company agreed that the market value should be taken, rather than that the seat should be retained until the price requested would be met. George said that when he heard from Mrs. Pinney he would inform the trust company and on the next day George, after conferring with Strong, decided to offer the seat at $450,000. When this was done Campbell informed Strong.

Mrs. Pinney during most of the time just referred to had been writing to McLaughlin complaining of various matters. The last of these letters was on August twenty-fourth, but in none of them did Mrs. Pinney refer to any demand that the seat be sold or to the alleged agreement to sell it for from $440,000 to $450,000.

Late in August McLaughlin wrote Mrs. Pinney that the trust company had been in favor of selling the seat, but that her adviser in financial matters was disinclined to sell for the then prevailing price though that had been over the price being paid at the time the letter was written. Shortly thereafter Mrs. Pinney saw George who again urged the sale, informing her that seats were then selling for about $400,000. She was agreeable to a sale at this price, but the next sale on September eighteenth was for only $325,000.

It was at this time, on September ninth and October fifteenth, that Mrs. Pinney first stated in letters that she had nothing to say about the sale of the seat; that she had been agreeable to anything the executors thought best and that she had repeatedly said she was willing to sell during the past year. Clearly from the other conversations and correspondence detailed, these statements were contrary to fact and were made at a time when

Mrs. Pinney's advice from her financial advisor had proved to be based on mistaken judgment.

It was after consultation and correspondence with Strong, George and Beekman, Bogue & Clark, that Mrs. Pinney delivered her letter of November 7, 1930, in which she said that in view of the present quotations for seats it was her desire that the trust company " withhold the sale of the said seat until further advised by me, either directly or through Mr. Harold Strong of Hemphill, Noyes & Co. New York City." It was upon this letter that the surrogate based his finding of a " true estoppel " already mentioned.

In a letter dictated in her presence by Mrs. Pinney's Chicago attorney on May 13, 1932, to George, and also in a letter written to him by Mrs. Pinney herself at the same time, there was clearly conveyed the impression that there was no intention to involve George, but that the trust company alone was to be held responsible. Certainly if Mrs. Pinney had no complaint against the individual executor with whom she had been in such close relationship, she could have none against the trust company who had been relying upon George and Strong because of her wishes.

As already noted the failure to sell at the price at which the seat was first offered in October, 1929, namely, $496,000, was due to the market collapse. It seems to us the failure to sell subsequently was not because the executors did not wish to sell, but because of the failure or refusal of Strong to agree upon a price at which the sale could have been readily made. The price at which the seat was at any time offered was considerably above the bid price or the prices at which seats were being sold.

As already noted, Mrs. Pinney denied the substance of various conversations with Wolcott and Campbell and with McLaughlin, in which she is claimed to have stated that she would rely, or was relying, upon Strong's judgment. She also testified that she had made oral demands that the seat be sold. It is significant, however, that she at no time committed such a demand to writing.

Strong, called by the objectant, testified that he at no time personally fixed the price at which the seat was offered and that he was consulted as to price only after it had been fixed, at which time he was merely asked for his approval. Concededly, however, save in one or two instances, he was always consulted whenever a price was placed upon the seat. Again we may pertinently ask why he was consulted even for his approval as to price unless Mrs. Pinney had given some instructions in the premises?

As already noted, the surrogate has found that there was a " true estoppel " against Mrs. Pinney by virtue of the letter of November 7, 1930, wherein she expressly consented that the trust company

withhold the sale of the seat to await further advice from her or Strong. What stronger corroborative evidence of her reliance upon Strong's advice as to the sale of the seat than her having finally named him in this formal writing.

There remains the question whether the evidence heretofore outlined does not form the basis of an estoppel prior to the date fixed by the surrogate. In our view these facts lead to as true an estoppel as that found in the letter mentioned.

It may be and probably was true, that the executors under the terms of the will should have exercised their own judgment and insisted upon a sale shortly after they had qualified. But were they not justified in the circumstances here disclosed in giving some heed to the wishes of Mrs. Pinney, the sole beneficiary under the will and who would ultimately take the net proceeds? As already noted, it was the chief asset of the estate, and in addition, it had been purchased with money borrowed by the testator from her.

It has long been recognized that an executor or trustee may properly respect the wishes of a living beneficiary. In Bogert on the Law of Trusts and Trustees (§ 941) it is stated:

" The rules for the administration of trusts, established by the trust instrument, statute, and court rules, are solely for the benefit of the *cestui*. If he voluntarily withdraws from their protection, when fully competent, he ought to be permitted to do so. There is nothing against public policy in giving validation to his consent. He cannot come into equity and complain of an act which he has expressly sanctioned without violating the ' clean hands ' doctrine of chancery.   *   *   *

" The application of the consent doctrine, in avoiding liability to a *cestui*, is common."

It is well settled also that the terms of a will or the rules of law applicable thereto may be modified by an agreement between the representatives of the estate and all persons interested in the subject-matter and that where such arrangement is made or consent given, without imposition or fraud, the parties consenting thereto are estopped to question the retention of securities or the ultimate loss. It has also been held that it is within the power of beneficiaries to consent to investments in securities not authorized as legal investments, and that parties who thus participate in a technical breach of trust by the executors or trustees are bound by their action and consent and are estopped from claiming a surcharge in a situation which they themselves have helped to produce. In such circumstances equity will lend no aid and the principles of estoppel and express acquiescence preclude a sur-

charge against the representatives of the estate. (*Matter of Garvin*, 256 N. Y. 518; *Woodbridge* v. *Bocks*, 59 App. Div. 503; affd., 170 N. Y. 596; *Slater* v. *Slater*, 208 App. Div. 567; affd. on opinion below, 240 N. Y. 557; *Matter of Hall*, 164 id. 196; *Matter of Kern*, 159 Misc. 682.)

In *Matter of Varet* (181 App. Div. 446; affd., 224 N. Y. 573) there was a direction by the testator to sell his real estate and personal property and to convert it into money, coupled with the direction that the same be done " as soon as may be after my decease." After reviewing numerous authorities wherein directions of like tenor were considered, this court said: " Following this unbroken line of authorities, we are constrained to hold that the words relied upon by the appellants are not susceptible of the peremptory construction sought to be applied to them, and that notwithstanding the use of these words in the will, the discretion of the executor as to the time for selling the securities remained unfettered, provided as was the case here that he acted in good faith, without neglect and in the honest exercise of his best judgment."

We perceive no reasonable distinction between the phrase " as promptly as possible " used in the will here under consideration and the phrase " as soon as may be after my decease."

Strong reliance is had by the objectant on the decision of this court in *Matter of Frame* (245 App. Div. 675, 685). This case, however, is clearly distinguishable upon the facts. In that case there was chiefly acquiescence by silence without duty to speak. In addition there were conflicting interests involved. The individual trustee was found to have been acting, not for the protection of the estate as a whole, but for his own interest as residuary legatee. Here it is to be noted that neither the individual nor corporate executor had any interest to serve but that of the objectant, practically the sole beneficiary of the entire estate.

As already noted, not only the referee, but the surrogate absolved the executors from any intentional wrong-doing. Nor did the surrogate find that they benefited or could have benefited in any way. No other conclusion is possible from the evidence.

It is urged, however, that a different rule should apply to the sale of a Stock Exchange seat which has a highly speculative value subject to wide fluctuation in price due to market and general economic conditions. In support of this our attention is called to the language used by the late Surrogate KETCHAM (opinion unreported) in *Matter of Hearns*, which was considered by the Court of Appeals (214 N. Y. 426). In that case both the will of the testator and a partnership agreement between himself and one of the defendants who was named as an executor, directed

that in case of the testator's death, his partnership in the Stock Exchange seat should be sold at once and the proceeds paid in full to the surviving liquidating partner, who was to wind up the business of the partnership and pay to his estate the testator's share of the profits and of any capital to which he might be entitled. The defendant executor, who was the surviving partner, and another, named as executor, failed to dispose of the membership, but included in their accounting a statement showing that there had been a liquidation of the partnership assets other than the Stock Exchange membership and that the decedent's interest therein was charged to them at its appraised value. Under the language of the will and the partnership agreement, the surrogate held that in the circumstances the executors were required to sell the seat within sixty days after the executors had qualified, and they were accordingly held liable for the consequent loss for their failure so to do.

It is to be noted that the Court of Appeals in upholding the surrogate did not apply any special rule with respect to a Stock Exchange seat. It is true that the findings of the surrogate, including his conclusion that under the circumstances the sale of the seat should have been consummated within sixty days after qualification, were adopted. The Court of Appeals, however, did not state that there was anything peculiar respecting the sale or retention of an asset of a Stock Exchange seat. They merely stated that the executors were liable " under the circumstances disclosed " (p. 430). This is in line with the general rule of law that invariably the question of negligence or estoppel upon the facts is to be determined from the peculiar circumstances of each case. Here, the questions of negligence and estoppel must be determined from the particular facts of this case.

It is our conclusion, therefore, that the determination reached by the referee who saw and heard the witnesses and to whom, in the first instance, was intrusted the duty of judging their credibility and of passing upon the facts, was correct. (*Boyd* v. *Boyd*, 252 N. Y. 422, 429.)

It follows that the decree of the surrogate should be reversed as indicated, and the report of the referee confirmed, with costs to the executors payable out of the estate, and the matter remitted to the Surrogate's Court for further action in accordance with this opinion.

TOWNLEY and GLENNON, JJ., concur; MARTIN, P. J., and COHN, J., dissent and vote for affirmance.

MARTIN, P. J. (dissenting). Claude C. Pinney died on June 27, 1929, leaving a last will and testament under which he gave all his

property outright to his wife, Katherine C. Pinney, and named the Brooklyn Trust Company and Charles H. George as executors. The principal asset of his estate was a seat on the New York Stock Exchange. The will was not admitted to probate until October 9, 1929. Meantime the Brooklyn Trust Company was appointed temporary administrator. Although the temporary administrator, as such, could have sold the Stock Exchange seat, it did not do so, and the seat came into the control of the executors. The will contains the following direction:

" *Third.* I authorize and direct my Executors to sell my membership in the New York Stock Exchange *as promptly as possible* after my decease and to pay the Ten thousand dollar gratuity fund attached to said membership to my wife Katherine C. Pinney."

The direction to sell " *as promptly as possible* " has not been complied with. The seat has not been sold. The temporary administrator and the executors named in the will filed an accounting. The widow filed objections thereto. The testimony in this proceeding was taken before a referee who absolved the executors. The decree of the surrogate settling the account has dismissed the objections to the account of the temporary administrator and has surcharged the executors for their failure to sell the seat within sixty days after the date of their qualifications. From that decree both parties have taken an appeal.

The surrogate properly dismissed the objections to the account of the temporary administrator. The temporary administrator had power to sell, but it was not its duty to do so. The relatively slight increase in the price of seats during the period of the temporary administration in itself is insufficient to justify a surcharge.

The main issue on this appeal is: May the executors be surcharged for their failure to sell the Stock Exchange seat? The executors maintain that the widow is estopped from raising any question in connection with the failure to sell the seat because what was done was encouraged and affirmatively directed by her; that her instructions on the subject were that they should rely on the advice and suggestions of her business adviser, Harold Strong; that they have followed these instructions, and she should not now be allowed to complain.

After the death of the testator, Mrs. Pinney consulted the law firm of Beekman, Bogue & Clark, and they represented her in connection with the temporary administration. This firm was retained by the executors. A labored effort has been made to make it appear that they were attorneys for Mrs. Pinney. The fact is that they were attorneys for the executors throughout the administration of the estate, have been their attorneys in the filing of the

accounting, on the trial in this proceeding, and on this appeal. The record is clear that they realized that they were, in reality, attorneys for, and their professional obligation was to the executors, no matter how friendly they may have been toward the beneficiary.

Before the will was admitted to probate and while the estate was still in the hands of the temporary administrator, Mrs. Pinney left New York to go to California. Prior to her departure, in connection with a loan which she had obtained from the Brooklyn Trust Company, she sent a letter to the trust company inclosing a power of attorney which she had executed in favor of Ralph S. Wolcott, William L. Bainton and Leslie B. Soper, of the firm of Beekman, Bogue & Clark. This power of attorney authorized the named individuals, among other things, to settle, adjust or compromise any claims which she might have as sole residuary legatee, to receive any money, securities or property and receipt for the same and to deliver title in any manner with respect to her interest in the estate; to consent to the judicial settlement of the executors' accounts and execute waivers of citations. This power of attorney in no way restricted the attorneys in fact and did not condition their action upon approval by anyone. Mrs. Pinney was not in New York again until January, 1930. She visited New York thereafter only at intervals.

Following the issuance of letters testamentary to the executors steps were taken immediately looking toward a sale of the Stock Exchange seat. It could be sold only in accordance with the rules and regulations of the Exchange. Matthew M. Campbell, a member of the firm of attorneys for the executors, went to see the secretary of the Stock Exchange about the time letters testamentary were issued and took up with him the procedure for the selling of the seat and the then market prices of seats. Campbell was informed by the secretary that the last sale price was $498,000 and the last asked price was $496,000. Campbell reported this to Ralph S. Wolcott, another member of the firm. Wolcott testified that on the day the will was probated, or the day before, he discussed the offering of the seat with Strong and said he wanted to ascertain his idea as to price; that he advised Strong that the last sale was for $485,000, and that he, Wolcott, had discussed the question of the sale with Mr. George by telephone. Wolcott testified that Strong suggested the offer go in at $496,000. George testified that after talking with Mr. Wolcott and Mr. Strong it was decided to put in the seat at $496,000. George's testimony is not very helpful because he gives conclusions and not what was said by anyone. Strong testified that either Wolcott or George called him on the phone and said: " We have decided to put in the

seat at $496,000." It was desired to know what Strong thought of it. Strong denies that he suggested a price of $496,000. Under date of October 8, 1929, the attorneys wrote the trust company, in part, as follows: " We enclose herewith a form of letter which you will please sign addressed to the Secretary of the Stock Exchange authorizing the sale of Mr. Pinney's membership. The last sale, we are informed, was for the price of $498,000, and membership is being offered at the present time for an asked price of $496,000. We suggest that a sale of the membership owned by Mr. Pinney be authorized at $496,000, and if at a later date we decide to decrease or increase this price, we can do so. Please write a letter following the enclosed form on your own stationery and send it to us. We shall then transmit it to the Secretary, Mr. Ashbel Green, with a certificate of letters testamentary and New York waiver."

The blotter sheets of the office of the attorneys for the executors carry the following entry under date of October eleventh: " Oct. 11 MMC. confers with RSW in re sale of Stock Exchange seat and price for same. It is agreed that $496,000 is the proper price. RSW. telephones Mr. Strong re this, also Mr. George, and this price meets with their approval."

This entry corroborates Strong's testimony. As we read the record the price of $496,000 was decided upon in the office of the attorneys for the executors and, as the blotter entry indicates, Strong approved of it.

In the face of this testimony it is idle to say there could not have been an advantageous sale within a reasonable time.

The letter offering the seat for sale at $496,000 was not delivered to the Secretary of the Stock Exchange until October fifteenth. Seats were being sold almost daily and no one made any inquiry as to whether there had been any change in prices between the first consultation with the secretary of the Exchange and the time when the letter fixing the price was delivered to him. The fact is that there was a downward fluctuation.

On October 28, 1929, the historic collapse of the stock market took place. On October twenty-ninth Campbell consulted the secretary of the Stock Exchange. The latter advised taking no action toward selling the seat at that time, as he believed that, after the condition of the market had settled and normal trading was resumed, memberships would be as valuable as ever. Campbell testified that the next day he talked to Strong and advised him of his conversation with the secretary of the Exchange, and Strong said he was going to consider the advisability of lowering the offered price to $480,000. The blotter entry covering Campbell's conversation with Strong states: " MMC talks to Mr. Strong of Hemphill,

Noyes re present status of proceedings to sell Stock Exchange seat. Mr. Strong expressed opinion that we should lower our authorized price to $480,000."

Under date of November 1, 1929, Campbell wrote to Mrs. Pinney reporting his talk with the secretary of the Stock Exchange, but making no mention of Strong's advice to lower the price of $480,000. George, the individual executor, had consulted with others regarding the situation. On November 12, 1929, a letter was sent to the secretary of the Stock Exchange authorizing the sale of the seat at $475,000. George's testimony with reference to the fixing of the new price of $475,000 indicates that this was done without consultation with Strong.

After November 12, 1929, no change was made with reference to the offered price until April, 1930. At the end of March the attorneys for the executors wrote to Mrs. Pinney urging her to indicate a price at which the seat should be sold. Under date of March 31, 1930, Mrs. Pinney wrote Campbell a letter in which she said: " I had a letter from Mr. Strong in regard to the seat. I am agreeable to his suggestion $440,000 to $450,000, whatever Mr. Strong says will be alright with me." This letter was received by the attorneys for the executors on April 3, 1930. At that time there was still on file with the Exchange the second offering of the seat at $475,000. After receiving Mrs. Pinney's letter the attorneys telephoned to the Stock Exchange and directed withdrawal of the $475,000 offer. The record indicates that this was done without consultation with Strong. In fact, it was done without consultation with the individual executor. On April 9, 1930, the seat was offered for sale at $490,000. It is the claim of the executors that this price was fixed by Strong. The president of the trust company testified that on April ninth he sent for the individual executor and told him that in his opinion the seat should be sold then and there at prevailing prices. George testified that he declined to authorize a sale at the then market price of $467,000. His testimony is that he suggested that Strong's advice be followed. Wolcott phoned Strong and as a result of this telephone conversation between Wolcott and Strong, Strong on Wolcott's request wrote the following letter:

" Confirming telephone conversation of today, I had a talk with Mr. George, who is sailing on Friday for Europe, to return sometime in May. He said that he was writing a letter to the Brooklyn Trust Company, stating that anything which I cared to do for Mrs. Pinney or for the estate had his entire approval. He also agreed with me that we should offer the seat for sale at $490,000. I understand that you have taken up this matter today with the Stock Exchange.

" Looking forward to talking the whole matter over with you in the next few days, I am."

It is necessary to consider the sequence of events leading up to the fixing of the price of $490,000. On April 5, 1930, an officer of the trust department of the trust company sent a memorandum to the president of the trust company reporting the fact that on April 4, 1930, a sale of a seat at $467,000 had been reported in an evening paper. The memorandum drew attention to the fact that the inventory value of the seat was only $395,000. On April 9, 1930, the president of the trust company and the individual executor had a conference. At the conference between the president of the trust company and the individual executor no price was fixed. George, the individual executor, before calling upon the president of the trust company, had made no inquiry as to the status of the market for seats. After leaving the trust company George testified he consulted with Strong, but before consulting with Strong he called the Stock Exchange and talked with the secretary, and he also talked with the attorneys for the executors. George discussed with the secretary of the Exchange the price of $490,000. He also talked to Strong and told him what he had learned from the secretary of the Stock Exchange. He testified that he told Strong that the lowest price at which the seat was being offered was $490,000. On the same day George wrote a letter to the trust company reading as follows:

" Since our conversation regarding the Pinney Estate and the Stock Exchange seat, I have discussed the sale of the Stock Exchange seat with Mr. Harold Strong, of Hemphill, Noyes & Company, and also with Mr. Ashbel Green, Secretary of the New York Stock Exchange. As a result the seat has been offered for sale at $490,000. There are no other seats offered at this price or at any lower price. This arrangement will be agreeable to Mrs. Pinney, with whom Mr. Strong is in communication. * * *

"Should they decide to change the price at which the seat is offered, this will be agreeable to me, and will have my approval on my return in the middle of May. In the event that any other questions come up with regard to the Estate during my absence, I will approve of any action taken by Mr. Strong in the matter.

" I am sending a copy of this letter to Mr. Strong."

Strong testified that George came to him on April ninth and said he had a meeting with the secretary of the Exchange and that the secretary thought that the seat could be sold for $490,000, and George wanted to put the seat in at $490,000, and Strong agreed with him. The record indicates that it was George who fixed the price of the April ninth offer at $490,000, and that Strong acquiesced in that.

George went to Europe after the April ninth price fixing. After his return in May, 1930, George had a conference in New York with Mrs. Pinney. He testified that he suggested that the seat be sold at prevailing prices. Mrs. Pinney agreed to this, and there is no record of any reservation or qualification.

On June 4, 1930, the attorneys for the executors received an offer for the seat made by a representative of the Stock Exchange, Mr. Hulsaver. Hulsaver testified that on June 4, 1930, he called the attorneys for the executors on the telephone and spoke with Campbell and told him that he thought he could sell the Pinney seat at $470,000, if they wanted to sell at that price, and, according to Hulsaver, Campbell said they would have to get in touch with Mrs. Pinney, and Mrs. Pinney was not in town, to which Hulsaver replied that he had to know right away because he did not want to lose the buyer, and he could not hold it up if it took two or three days. This offer to the attorneys for the executors was not communicated by them to any one.

On June 14, 1930, Campbell discussed with George a reduction in the offering price of the seat. As a result of this discussion, George advised Campbell to reduce the figure to $470,000. The testimony is that this was done without any discussion with Strong. There is a letter from Campbell to the trust company under date of June 16, 1930, which states: " Upon the advice of Mr. George, your co-executor, and Mr. Harold Strong, Mrs. Pinney's financial adviser, we have instructed the Secretary of the Stock Exchange to reduce the price at which the Stock Exchange membership is offered from $490,000 to $470,000. Kindly sign the enclosed letter giving written confirmation to these instructions and send it directly to the Secretary of the Stock Exchange with a conformed copy to us."

The statement contained therein that the price had been reduced upon the advice of George and Strong, Mrs. Pinney's financial adviser, is not correct, because Strong was not in the city at the time, being away on a fishing trip between May twenty-ninth and June seventeenth or June eighteenth and knew nothing about the change until his return. The price was lowered on George's direction and not as a result of any consultation with Strong. Upon returning to the city Strong expressed an opinion that the price should be reduced to $450,000 or $445,000. George took the matter up with Campbell, and the price was lowered to $450,000. George testified that this price of $450,000 was fixed independently of Strong. This offering price of $450,000 was given to the office of the secretary of the Stock Exchange on June 19, 1930, and that price remained in force up to the date of the accounting.

The record indicates that in the Spring of 1930 the executors began to manifest anxiety about how they had discharged their duties, and they developed a campaign to free themselves from criticism, which culminated in their obtaining the letter of November 7, 1930, which has been held by the surrogate to be a direct estoppel.

The conduct of the executors indicates that they did not believe they were obliged to consult Strong and follow his advice and suggestions. In fact, they sought advice and suggestions elsewhere, decided for themselves, and, at times asked for approval by Strong. The first price was determined upon by the attorneys for the executors, and Strong was asked for his approval. The second price was fixed without his approval. The third price was fixed by the individual executor, and Strong acquiesced in it. The fourth price was fixed without consultation with him, and the fifth and final price was fixed independently of him. In fixing the prices, Mrs. Pinney's ideas, as expressed in her March thirty-first letter, were not followed out; her willingness, as expressed in May, to sell at the market, was not considered, and the June fourth opportunity to sell at $470,000 was permitted to pass without consultation with Strong or Mrs. Pinney.

Nor do we consider the expressed wish of Mrs. Pinney that Strong be consulted was any restriction or limitation on the free discharge of the duties of the executors. Strong had been a business associate of Mr. Pinney; he was a member of the firm where Mr. Pinney had had his office, and for which firm Mr. Pinney had executed orders on the Exchange. As the executors, in their brief, say: " It was natural that Mrs. Pinney should turn to Mr. Strong for advice." The executors, in their brief, maintain that Mrs. Pinney imposed her will upon the executors by the use of an adviser as to the time and price of the sale of the Stock Exchange seat. The record fails to establish any such imposition. But if the executors had allowed Strong to control the estate, they would have adopted him as their agent and would be responsible for his conduct. (*Earle* v. *Earle*, 93 N. Y. 104.) In Perry on Trusts (7th ed. § 408) it is said: " A trustee may delegate ministerial duties but if he delegates *discretionary* powers he becomes a guarantor and if a trust is of a *discretionary* nature, the trustee will be responsible for all the mischievous consequences of the delegation, and the exercise of the discretion will be absolutely void in the substitute. Nor can a *discretionary* trust be delegated to a cotrustee. (*Crewe* v. *Dicken*, 4 Ves. 97; *Caldwell* v. *Graham*, 115 Md. 122; 80 Atl. 839.) "

It is urged that Mrs. Pinney should not now be heard to complain because of her acquiescence. What did she acquiesce in? Only a

price fixed by the executors on some occasion. Emphasis is placed on the letter written by her in December, 1929, in which she wrote that she, too, was in favor of holding for a better price. This was simply echoing sentiments of the executors. It is urged that her acquiescence is sufficient to support an estoppel.

In Pomeroy on Equity Jurisprudence (4th ed. § 804) " equitable estoppel " is defined as follows: " Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

In the following section (§ 805), covering the essential elements constituting an estoppel, it is said: " 5. The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. 6. He must in fact act upon it in such a manner as to change his position for the worse; in other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct and to assert rights inconsistent with it."

Can it be fairly said that the executors have been induced to act or refrain from acting upon anything Mrs. Pinney said or wrote? Our analysis of the record indicates that they did not feel bound by her instructions to look to Strong for advice and suggestion. They never took a positive position with reference to selling, and cannot now say that they were dissuaded from acting by either Mrs. Pinney or Strong. Nothing either of these said or did may be claimed to have misled the executors into improperly retaining the seat. An attempt was made on the part of the corporate executor to show that in April, 1930, it insisted upon the seat being sold. The record shows that the corporate executor was not very insistent and readily acquiesced in the unwillingness of the individual executor to sell at the market. Neither Strong nor Mrs. Pinney had anything to do with this. Down to the date when the executors obtained the letter from Mrs. Pinney, under which she became responsible for further delay, the executors could have insisted either upon selling or being relieved from the responsibility for the delay in selling. The difficulty in this case is due to the failure to take a definite stand on the part of those obligated to do so.

As we pointed out in *Matter of Frame* (245 App. Div. 675) there is no duty on the part of a beneficiary to demand that executors

discharge their duty. They are obligated by law to do so. What was the executors' duty here? It was, independent of the directions contained in the will, to sell the seat with reasonable diligence.

In *Matter of Hearns* (214 N. Y. 426) there was a direction in the will that a sale of the decedent's membership in the New York Stock Exchange be made " as soon after my death as possible." Speaking of this provision in its application to the unusual character of the estate asset, the surrogate, in his unreported opinion, said: " From these authorities and with the utmost indulgence to the executors, it appears that an act to be done ' as soon as possible ' is to be done within such time as shall be found as a matter of fact to be reasonable in view of all the circumstances surrounding the act to be required. Where the thing to be sold is a piece of intangible and unproductive property which is subject to fluctuation in value and dependent for its availability upon the will of an unincorporated association and other vicissitudes, and which further has a present market, the time in which it is to be sold cannot be more than sixty days after the duty of sale is assumed. * * * This was not an investment, and whatever it may be called, it is governed by the emphasized direction which names it and cannot come within the general authority."

The Court of Appeals approved the surcharge for failure to sell within sixty days. In view of the complete knowledge of the situation which the corporate executor acquired during the period of the temporary administration, and the mandatory direction in the will, it is not unreasonable to hold that in this case, too, the seat should have been sold within sixty days after letters testamentary were issued.

During the trial evidence was offered to show that the executors had positive knowledge that the testator was most anxious to have the Stock Exchange seat sold immediately upon his death. Any evidence in addition to the will that brought home to the executors such intention of the testator was, we think, competent and should have been admitted solely for that purpose. It was shown that the written instructions of the testator in his own handwriting delivered to Mr. Burdick, the attorney who drafted the will, stated " 2nd: Sell my seat on N. Y. Stock Ex *at once*," the words " at once " being the only words underlined in the entire letter of instructions. Although the letter itself was excluded, improperly we believe, the evidence admitted shows that this letter came into the possession of the Brooklyn Trust Company prior to July 5, 1929, and within a week after the testator's death and was thereafter retained by the trust company. A photostatic copy of this letter of instructions

was on July 10, 1929, mailed by the trust company to Mr. George, the other executor.

There appears to be no doubt that this, in addition to the other testimony, emphatically and pointedly called the attention of the trust company and of the individual executor to the necessity of selling the Stock Exchange seat immediately.

The sale of a Stock Exchange membership is a relatively simple matter. The office of the secretary of the Exchange acts as intermediary and endeavors to assist members in the purchase and sale of seats. Prior to the crash at the end of October, 1929, seats were being sold without much difficulty and even following the collapse sales were being made. Diligence should have prompted the executors to keep in touch with current prices and adjust their price accordingly. Fixing the price in excess of the amount at which seats were being currently sold was unlikely to bring about a sale and was, in fact, a speculative effort to get something above the market. This certainly was not conducive to selling " as promptly as possible." Furthermore, the record indicates that for weeks at a time no interest whatever was taken in the condition of the seat market.

The administration of this estate created a situation free of any intricacy. There was no trust. The sole beneficiary was Mrs. Pinney, an adult. There were no infants involved. It was an estate of the simplest form, the administration of which could have been carried through without much difficulty by the widow. The only asset which might present an unusual problem was the Stock Exchange seat, an unproductive asset. Had the testator intended that his widow would have to solve the problem of its sale, it would have been an easy matter for him to have designated her as executrix, and thereby placed the responsibility on her. Instead he selected a friend and a corporate executor, no doubt having in mind, with reference to the latter that it afforded, at least a promise of rigid obedience to the will and that its resources and financial responsibility were a guarantee of fidelity to the trust. (Jessup-Redfield Surrogates' Courts [3d ed.], § 506.) The testator was willing to have the net estate coming to his widow reduced by the amount of commissions (in this instance, a considerable sum) so that the sale would be promptly made by presumably competent executors. We find that both executors have failed in the discharge of their duties. The corporate executor would have it appear that it was depending upon the individual executor and also upon Strong. That should not relieve the corporate executor from carrying out a duty which it assumed. As we pointed out in *Matter of Frame (supra)*:

" Corporate executors and trustees should not act as such unless they intend to give proper attention to the duties required to properly administer an estate. It is their duty to protect those whose interests are intrusted to their care."

In February, 1930, the corporate executor raised the question as to the power of Mrs. Pinney to direct the executors what to do, and we find them being advised by their attorneys that she had the right to regulate the price at which the seat could be sold. We know of no authority which gives to beneficiaries the right to dictate to executors. The lack of attention given by the executors to carrying out their trust leaves them open to suspicion that in this estate they were interested in little beyond the taking of commissions for acting as executors.

We agree with the surrogate that the letter of November 7, 1930, constitutes a direct estoppel against any claim for injuries by retention of the seat after that date, and that in fixing the amount of surcharge the executors are entitled to credit determined by the worth of the seat on that date.

We also agree that the executors are not entitled to commissions because of their negligence and maladministration of this estate.

The attempt to escape liability by asserting that the beneficiary or a third party who had no duty in the matter should be held responsible for the failure to obey a positive direction in a will made by a man who in making his will was familiar with the subject and knew that he was dealing with an unproductive asset, should not be permitted. If we do permit it a person's will is of little value when executors wish to ignore its mandates.

The decree of the surrogate should be affirmed.

COHN, J., concurs.

Decree reversed as indicated in opinion, and the report of the referee confirmed, with costs to the executors payable out of the estate, and the matter remitted to the Surrogate's Court for further action in accordance with opinion. Settle order on notice.