HAWAIIAN TRUST COMPANY, LIMITED, AND HERBERT M. DOWSETT, TRUSTEES UNDER THE WILL AND OF THE ESTATE OF JOHN H. CONEY, DECEASED, AND SCHUMAN CARRIAGE COMPANY, LIMITED, *v.* NORMA LEVEY GONSER, LEONIE A. KELTNER, MARY E. CONEY, WILLIAM A. CONEY, GEORGE M. CONEY, KATHERINE K. C. HUTTON, CLARISSA P. C. GERDES, ELIZABETH K. C. RENJES, ELLEN GRAHAM FEATHER, HOWARD HENRY GRAHAM, FRANCES G. DOWNING, JOAN LORIMER GRAHAM HANCOCK, MARY DOUGLAS GRAHAM MARTIN, JAY GOULD III AND ANNE GOULD WOGOMAN VALENTINE, AND HARVEY A. HUTTON AND MALCOLM G. HUTTON.

NO. 2893.

ARGUED MAY 27, 1953.               DECIDED JUNE 19, 1953.

TOWSE, C. J., LE BARON AND STAINBACK, JJ.

On June 21, 1951, the trustees of the estate of John H. Coney, deceased, filed a bill for instructions in the circuit court of the first judicial circuit of the Territory of Hawaii requesting that the court determine that they, the trustees, had power to sell and convey certain real property held in the trust estate and that they be authorized to sell and convey the same to the Schuman Carriage Company, Limited, upon the terms which they had previously agreed to with Schuman, the prospective purchaser. Service was made upon the respondents, the life tenant, Mrs. Elizabeth K. C. Renjes, and a number of remaindermen. The Schuman Carriage Company, Limited, intervened pursuant to an ex parte order of the court made and entered on the same day that the petition for intervention was filed.

John H. Coney died in 1880 while a resident of Honolulu, leaving real property situated in Honolulu. His will, duly admitted to probate, dealt separately with the property with which the present proceedings are concerned; this property is a portion of the premises which were occupied at the date of the testator's death as his home and that of his family. At that time it comprised approximately two-thirds of the block surrounded by Beretania, Richards, Miller and Hotel streets in Honolulu and was located in what was at the time one of the finest residential districts in Honolulu. The home premises were described in the will as "my land houses and premises situate on Richards Street Honolulu" and were devised to the trustees "Upon trust for the use of my family as and for a Homestead to be and remain under the sole and entire control of my Sister Mrs. Anderia A Haalelea during her life, and from and after her decease then the same to be under the control of my wife And from and after the decease of the survivor of them Then the same to be under

the control of my eldest child for the time being and after the decease of all my said children Then upon trust to sell the same and to divide the proceeds in equal portions among the then surviving children of my children share and share alike * * *."

Following the testator's death the widow, Laura A. Coney, continued to reside in the home premises.

A portion of the premises of the home premises was leased to the University Club for a term of twenty-five years from August 1, 1910, the lease being executed by the widow, Laura A. Coney, as the then sole trustee of the trust estate, and joined in by the five children of the testator then surviving. The rental received from the University Club became insufficient to cover taxes, insurance and assessments on the property so that it became necessary for the Hawaiian Trust Company, Limited, the then trustee, to advance funds from time to time to cover these deficiencies.

In January, 1927, a bill for instructions was filed in the circuit court of the first judicial circuit by the then trustee praying for instructions with respect to this situation and suggesting three alternatives: (1) a mortgage; (2) a long-term paid-up lease of all or part of the property; (3) a sale of the property. Answers were filed by various of the beneficiaries of the trust estate, all alleging that it would be to the best interests of the trust estate that a sale be made to the University Club of that portion of the homestead property then under lease to the club. An order finding the sale to be necessary in order to meet the exigencies of the situation and to protect the corpus of the trust estate and directing the trustees to make such a sale was made and entered on July 14, 1928, to take effect upon the filing with the court of written consents to the sale executed by all the adult beneficiaries, together

with the guardian ad litem of Clarissa P. Coney, and by the trustees. Such consents were filed and the sale was thereupon consummated.

This sale of the University Club premises reduced the home premises held in the trust estate to the present parcel with which this proceeding is concerned. This parcel has an area of 27,635 square feet, more or less, with a frontage on Richards street and Miller street and bisects the block bounded by Hotel, Richards, Beretania and Miller streets about midway between Hotel street and Beretania street.

Laura A. Coney was survived by four children of the testator, namely, Mary S. Ashton, John H. Coney, Elizabeth K. C. Renjes and Eleanor K. Vos. In the latter part of 1929 each of these surviving children of the testator addressed a letter to the trustees stating that they did not desire to make use of the home premises, or any part thereof, as a homestead and requested the property be leased by the trustees, subject to the approval of the terms and conditions by the children. The letter recited the understanding that the property could be leased only with the consent of all the life tenants and waived any claim to use the property for the purpose of a homestead or otherwise.

The lease of the premises for a term commencing April 1, 1932, and expiring March 31, 1952, was duly executed by the trustees and Mary S. Ashton, John H. Coney, Elizabeth Renjes and Eleanor Vos, and by various grandchildren of the testator as lessors, and by Schuman Carriage Company, Limited, as lessee. The premises have been improved by the lessee by the erection of corrugated iron sheds and have been paved with concrete and are in use as a portion of an automobile repair department of the lessee.

All of the testator's children were deceased at the time

of the filing of the present bill for instructions except Elizabeth K. C. Renjes who was then eighty-five years of age and who herself died December 31, 1952, subsequent to the decision of the chancellor.

By letter to the trustees dated March 30, 1951, Schuman Carriage Company, Limited, lessee, offered to purchase the property for the sum of $175,000. The trustees accepted this offer subject to the entry of a court order binding all parties in interest and authorizing the sale of the property upon the terms set forth in the letter from Schuman. In their petition the trustees, admitting that the will of the testator did not expressly confer upon them the power to sell the land herein involved, alleged that this was an implied power under the will. The trustees also relied upon the inherent power of the court of equity to authorize a deviation of the express terms of the trust and alleged that it was for the best interests of the trust estate to sell the property upon the terms upon which they had agreed with Schuman.

The answers of all appellants, except Mrs. Renjes, denied the existence of any power, express or implied, to sell the land involved and denied that it was to the best interest of the trust estate that the land be conveyed to Schuman upon the terms set forth in the petition. All of the beneficiaries who answered prayed that the petitioners be instructed that they could not consummate the proposed sale to Schuman. Mrs. Renjes, the last surviving child of the testator, joined in the petition at the time of the hearing but subsequently, and prior to the decision of the chancellor, withdrew such joinder and objected to the sale.

After the hearing and after the withdrawal of the consent to the sale filed by Mrs. Renjes, the chancellor filed a decree on March 11, 1952, authorizing the sale to the

Schuman Carriage Company, Limited, upon the terms agreed to by the trustees and the Schuman Carriage Company, Limited, prior to the filing of the petition.

The chancellor based his decision on two points: (1) the trustees had specific power of sale under the trust instrument and (2 ) a change of circumstances rendered the sale necessary in order to carry out the intention of the testator. In finding the trustees had general power of sale he called attention to a general provision of the will which conferred such power subject to the consent of the widow and sister of the deceased and to the approval of the court; that "Since the widow and sister had deceased, the necessity for their consent was thereby removed, subjecting the power of sale only to the approval of the chancellor." The court further held that "* * * under the inherent power of a court of chancery, * * * the court may authorize the sale as a deviation from the terms of the trust where a change of circumstances had taken place rendering such action necessary in order to carry out the intention of the Testator. * * * The hearing * * * disclosed that there was a sufficient change of circumstances to warrant authorization of the proposed sale. Therefore, the court affirms its oral ruling that a power to sell, by the trustees, exists."

The first ground of the chancellor's decision is erroneous as the will clearly discloses that the general power of sale expressed therein and relied upon by the court applies to premises other than the premises in question. A specific and contrary provision fixing a definite time of sale is included in the will with regard to the sale of this particular parcel of land, so the specific provision must govern over the general. As pointed out, the specific provision provides "after the decease of my said children Then upon trust to sell the same," etc. Obviously, the

general provision could not apply to the homestead property as that is not to be sold until after the death of all the testator's children and the testator naturally contemplated that his wife and sister would predecease the last of his children.

The second ground of the chancellor's decision is that a change in circumstances justifies the sale prior to the time specified by the testator. The only change of circumstances shown was, first, the premises were no longer located in a residential area and, second, the Master Plan for civic development called for eventual purchase or condemnation by the Territory of Hawaii.

The change from a residential to a business district took place many years ago; the place was last used as a residence in 1929 and the present lease was entered into at the solicitation of the life beneficiaries in 1932 because of the fact that none of them wished to use the same for residence purposes. The "Master Plan" can have little weight on the necessity for sale as the trustees did not even contact the attorney general's office to see how soon the Master Plan would affect the premises. Further, the testimony shows that no condemnation of the premises was immediately contemplated by the public works office of the Territory and the so-called "Master Plan" may be subject to change.

The chancellor in his holding cited a number of decisions, as have been cited by counsel for appellees, practically each of them dealing with residence property which had become business property and which was sold at the *request* of the beneficiaries, usually because of the change of the situation threatening the very existence of the trust by reason of additional taxes and lack of rental demand for the property in its condition as a residence.

That a court of chancery may authorize a trustee to

depart from the terms of the trust is well settled, but such departure is justified only "upon the occurrence of emergencies or unusual circumstances not anticipated by the settlor, in order to carry out his ultimate purpose, and to preserve, or to prevent loss or destruction of, the trust estate * * *." (54 Am. Jur., Trusts, § 284, p. 225.)

As stated in *Johns* v. *Johns*, 172 Ill. 472, 485, 50 N. E. 337, 342, the court, in refusing to order a sale, even though the beneficiaries consented to the sale, stated: "The mere fact that a sale of the land might benefit the beneficiaries more than the compliance with the terms of the trust does not furnish a reason for a decree ordering the title of the land to be disposed of in opposition to the manifest wish of the donor. The duty of the court in dealing with such a trust is to observe and carry out the purposes and plans of the donor, unless the preservation of the subject-matter of the trust, or some other like necessity, demands interference with his will and intention."

Among numerous cases where all of the beneficiaries joined in the prayer that such a sale would be for the best interests of all parties concerned are: *Bankers' Trust Co.* v. *Greims*, 108 Conn. 259, 142 Atl. 796; *Dyer* v. *Paddock*, 395 Ill. 288, 70 N. E. (2d) 49.

As stated in 3 Bogert, *Trusts and Trustees*, part 2, section 741, page 565: "* * * the lack of power * * * to sell * * * may be supplied by showing the consent of the beneficiary in advance that the sale take place * * *." This statement is made with reference to a trust containing no specific provision with regard to the power of sale as distinguished from the situation in the case at bar where the will definitely fixes the time and circumstances under which a sale may be made.

Though the trustees should not surrender control of the trust property and should exercise their own judg-

ment, it has been recognized by this court that a trustee may properly respect the wishes of the living beneficiaries. (*In Re Pinney's Estate,* 250 App. Div. 60, 294 N. Y. Supp. 29, cited in *Hartmann et als.* v. *Bertelmann et als.,* 39 Haw. 619, 630.)

Further, it clearly appears in the present case that there was no threat to the corpus of the trust and the sale was authorized in the face of opposition of all of the beneficiaries appearing, including the life tenant.

Again, 3 Bogert, *Trusts and Trustees,* part 2, section 742, page 571, states: "Something in the nature of an emergency is required to move the court to authorize a deviation from the settlor's plan of administration * * *."

In *Weakley* v. *Barrow,* 192 S. W. 927, 137 Tenn. 224, the statement is made: "The exercise of the power depends, not on expediency, but on exigency." In the *Weakley* case taxes on unimproved land were using up the income from improved property. (See annotation in 168 A. L. R. 1018, page 1027. On the same subject matter as to when a court of equity may order a deviation from the terms of the will and order the sale of property in order to prevent the enforced sale of property or otherwise destroy the estate, see Scott, *Trusts,* volume 2, sections 167 and 190.4.)

Though the chancellor stated that the withdrawal of the joinder and consent to the sale did not affect his decision "* * * since the court has decreed that the power to sell can be and has been invoked by the court of chancery under its inherent powers" and the trustees make little of the so-called consent of the life tenant which was withdrawn, the intervenor strongly urges that the life tenant having filed her approval cannot withdraw the same, that she is bound thereby, and that the court has authority to act because of this consent and change of condition.

There is little merit in this contention since there was

no change of position by the intervenor because of the original consent of the life tenant which was made subsequent to its offer to the trustees and withdrawn before the chancellor's decision.

Though the cestui of a trust may in some situations by his approval and consent make what would otherwise be an unlawful act under a trust lawful, the rule is ordinarily that a cestui cannot consent to the alteration of the trust and where a cestui has consented he may withdraw the same before it has been acted upon. (4 Bogert, *Trusts and Trustees*, pt. 2, § 941, p. 140.)

See also *Von Schrader* v. *Cornet* (Mo.), 3 S. W. (2d) 706, 711, where the trustees were held authorized to sell land after approval by over fifty per cent of the beneficiaries, beneficiaries who had consented to the sale may withdraw their consent before the sale has been ratified by more that the fifty per cent. In that case two of the beneficiaries after approving the same withdrew their consent before the necessary fifty per cent had consented.

The record does not disclose the reason the life beneficiary withdrew her consent to the sale. It may have been upon more mature reflection; it may have been after consultation with the remaindermen who opposed such sale, or by the realization that her own enjoyment of the income from the premises or from the proceeds of a sale thereof would be for a very short period, her life expectancy being between two and three years. (Her actual death occurred within little more than a year.) Whatever the reason, there being no evidence to the contrary, we must assume that she was *sui juris* and competent to act in the matter.

The present situation is quite different from 1927 when all the four surviving life beneficiaries sought the sale of a portion of the premises. In the present case there is no allegation showing that the estate is insolvent or in any

danger of becoming so without the liquidation of its real estate, or that the property in its present use is a drain on the trust estate, but the contrary. The trustees' own witnesses testified that a larger income could be derived from a lease than from the investment of the proceeds of a sale. Also, the sale would entail a large capital-gains tax. (See *Stone's Estate,* 59 Pa. D. & C. 37, *aff'd* 358 Pa. 335, 56 A. [2d] 664, where a trustee who had power to sell made a contract for sale upon an apparently fair price, yet the court set aside the contract and restrained the sale on the application of the living beneficiaries where the income from the proceeds of the sale would be less than that available from the property itself and would entail a large capital-gains tax.

It is unnecessary to discuss the propriety of intervention of a third party, in a case of a bill for instructions filed by the trustees, whose only interest is as a prospective purchaser of the property; nor as to the fair value of the property when there is no showing of a necessity to sell prior to the time fixed by the testator, but it may be noted that the amount received by sale, if invested, would not produce the income available by way of a lease; further, that the trustees made no attempt to find other purchasers or to make a new lease prior to asking for leave to sell the property to this particular purchaser, the Schuman Carriage Company, Limited; that the procedure followed by the trustees in the sale of the University Club portion of the premises was to sell at public auction after advertising and after public notice having been given.

The unanimous opposition of all the beneficiaries who appeared to the sale should be given weight in this case. After all, the cestuis are in equity the beneficial owners of the property.

There has been filed in this court a stipulation by all

parties herein that the record may show Elizabeth K. C. Renjes, the last surviving child of the testator, died on December 31, 1952. It was further stipulated that all of the grandchildren of the testator who were surviving at the time of the death of Mrs. Renjes caused a letter to be sent to the trustees wherein all the remaindermen of the estate of John H. Coney, deceased, elect to receive those certain homestead premises of the estate located on Richards street rather than the proceeds thereof in cash, and notified the trustees to refrain from any sale of the said property.

As the last life beneficiary has died, under the terms of the testator's will the trustees are given the duty to sell and distribute the proceeds of the homestead property among the testator's then surviving children of his children. However, the beneficiaries may elect to revoke the power of sale and take the land rather than the proceeds thereof. That the beneficiaries may so elect, see 3 Bogert, *Trusts and Trustees*, part 2, section 741, page 566: "Where the trustees are given power to sell land and distribute the proceeds among the beneficiaries of the trust, the beneficiaries may elect to revoke the power of sale and take the land, rather than the proceeds thereof."

Reversed.

*W. C. Ingman* (*D. N. Ingman* with him on the briefs) for respondents-appellants.

*H. B. Kidwell* (*Anderson, Wrenn & Jenks* with him on the brief) for petitioners-appellees.

*J. R. Cades* (*Smith, Wild, Beebe & Cades* on the brief) for intervenor-appellee, Schuman Carriage Company, Limited.